## PADILLA CONSTRUCTION SERVICES INC.
### 19 LIBERTY AVENUE
### STATEN ISLAND, NY 10304
#### TEL # (718) 980-4923 FAX (718) 980-7189



### FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| **TO:** CJ | **FROM:** ANGIE |
| **COMPANY:** K.G. INDUSTRIES, INC. | **DATE:** 01/25/2006 |
| **FAX # :** 718-433-2200 | **NO. PAGES:** |
| **TEL#:** 718-433-2211 | **SUBJECT:** ROOFING |
| **RE:** ROOFING CONTRACT | **PROJECT:** QCD14 DISTRICT 14 GARAGE & SALT SHED |
| FINALIZED | SANITATION DEPT. PROJECT NO: S173/197 |
| | EDGEMERE - QUEENS, NY |

(X) URGENT      ( ) FOR REVIEW      ( ) PLEASE COMMENT      (X) PLEASE REPLY ASAP

NOTES/COMMENTS:

HI CJ:

ENCLOSED IS AN ORIGINAL CONTRACT AND PAYMENT SCHEDULE
FOR YOUR RECORDS.

WE NEED YOU TO SEND TO PADILLA ALL OF THE SUBMITTALS AS
SPECIFIED IN THE CONTRACT AS SOON AS POSSIBLE.

PLEASE NOTE THAT ALL SHOP DRAWINGS ARE TO BE IN CAD PLUS
8 FULL SIZE COPIES.   PRODUCT DATA, CERTIFICATIONS, WARRANTIES
AND GUARANTEES ARE 8 COPIES OF EACH.

ANY QUESTIONS, PLEASE CALL US AT ONCE.

THANK YOU IN ADVANCE

ANGIE
ASSISTANT PM

CC: ALEX HOLUKA, VP; JEFF SA, PE, PM; CARLOS COSTA, SUPER, PRABHAT R, ASST PE

P:\201 Sanitation Garage\SUB-CONTRACTOR\K.G. INDUSTRIES INC. - ROOFING\FINAL CONTRACT RETURNED AND REQ FOR SUBMITTALS 012506.WK4

# SUBCONTRACT

**SUBCONTRACTOR:** <u>K.G. INDUSTRIES, INC.</u>

ADDRESS:     27-08 42ND ROAD

LONG ISLAND CITY, NY 11101

PHONE NO:   718-433-2211    FAX  718-433-2200


**PROJECT:**    <u>CONSTRUCTION OF A NEW QCD 14 GARAGE AND SALT SHED</u>

LOATION:     51-10 ALMEDA AVE, QUEENS, NEW YORK 11691


**SUBCONTRACT NO.:** <u>PO 3106</u>          JOB NO.: 201

COST CODE: 389-399


**PRICE: Furnish and Install  Approximately 54,500 Sq. Ft. of Roofing System SBS – Modified Bituminous Membrane Roofing ( Section 07552), Sheet Metal Flashing and Trims ( Section 07620), Building Insulation ( Section 07210 ), Joint Sealants ( Sections 07842 & 07920), etc., as per specifications and shop drawings, for the Lump Sum Amount of $606,535.00 Dollars.**


## *AGREEMENT:*

This Agreement, (hereinafter, this "Agreement" or this "Subcontract") made the **11th day of October, 2005**, by and between **Padilla Construction Services Inc.**, a New York corporation, with offices at 19 Liberty Avenue, Staten Island, New York 10304 (hereinafter "PCS" or "Contractor") and **K.G. Industries, Inc.** with principal offices at, **27-08 42nd Road L.I.C., NY 11104,** (herein "Subcontractor")


## *WITNESSETH:*

For the consideration hereinafter named, PCS and the Subcontractor, intending to be legally bound, do hereby mutually covenant and agree as follows:

## ARTICLE I
## DESCRIPTION OF WORK

1.1 The Subcontractor shall provide all to furnish and install SBS – Modified Bituminous Membrane Roofing (Section 07552), Sheet Metal Flashing and Trims (Section 07620), Building Insulation ( Section 07210 ), Joint Sealants for roof areas ( Sections 07842 & 07920), and related work required (hereinafter the "Work") for the Queens 14 Garage & Salt Shed Project (hereinafter the "Project").

1.2 The Subcontractor shall perform the Work in strict compliance with the drawings, specifications, addenda and bulletins thereto, prepared by Judd Designs / Da Silva Black Calcagni Chesser, Architects, P.C.; a Joint Venture (hereinafter the "Architect" and/or "Architect/Engineer") and as additionally defined in the annexed Schedules A, B, C, D and E which by this reference are incorporated herein as well.

1.3 As with the terms and provisions of the General Construction Contract (hereinafter the "Contract") between PCS and Department of Sanitation (hereinafter the "Owner").

1.4 The Subcontractor acknowledges that the drawings, specifications, addenda and bulletins may not be fully developed, and the Subcontractor agrees to perform all work not specifically mentioned in the aforementioned documents but which is required to make the Work complete, functional and or operational subject to the approval and acceptance of PCS, the Architect and the Owner.

1.5 The Subcontractor agrees that where no explicit quality or standard for materials or workmanship are established for the Work, the Subcontractor will perform the Work in strict accordance with the highest quality or standards applicable for the intended use, subject to the approval and acceptance of PCS, the Architect and the Owner.

1.6 The Subcontractor shall provide all labor, surveying, layout, hoisting, rigging, scaffolding and services of every kind necessary to complete the Work in a good, substantial, thorough, safe and workmanlike manner subject to the approval and acceptance of PCS, the Architect and the Owner.

1.7 The Subcontractor shall comply with all the requirements of and shall perform the Work in strict accordance with the Site Logistics Plan, PCS's Safety Plan, The Contract Schedule, and any amendments thereto instituted by PCS during the construction of the Project.

1.8 The work may require at least two separate mobilizations.

## ARTICLE II
## CONTRACT DOCUMENTS

2.1 The drawings, specifications, addenda, bulletins, Site Logistics Plan, PCS's Safety Plan, the Contract, and the Schedule (as hereinafter defined) are included as a part of and by this reference are incorporated into this Agreement insofar as applicable to the Work. Each document is available for examination by the Subcontractor at all reasonable times at the office of PCS. All of the aforesaid documents, including this Agreement together with all updates, revisions and modifications to such documents are sometimes collectively referred to hereafter as the Contract Documents. The Subcontractor represents and agrees that it has carefully examined and understands this Agreement and the Contract Documents, it has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed, and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of PCS, the Architect or the Owner, or any of their respective officers, agents, servants, or employees. With respect to the Work, the Subcontractor agrees to be bound to PCS by each and all of the terms and provisions of the Contract and the other Contract Documents.

2.2 The drawings are the graphic and pictorial portions of the Contract Documents, wherever located and whenever issued, showing the design, location and dimensions of the Work, and generally including plans, elevations, sections, details, schedules and diagrams. The specifications are the portion of the Contract Documents, wherever located and whenever issued, consisting of the written requirements for materials, equipment, construction systems, standards and workmanship for the Work, and performance of related services. Organization of the specifications into divisions, sections and articles, and arrangements of drawings shall not control the Subcontractor in dividing the Work among its subcontractors or in establishing the extent of the Work to be performed by any trade. The Subcontractor and all sub-subcontractors shall refer to all of the drawings, including those showing primarily the work of the mechanical, electrical and other specialized trades, and to all of the sections of the specifications, and shall perform all work reasonably inferable therefrom as being necessary to produce the intended results. The drawings, specifications and other documents prepared by the Architect are instruments of the Architect's service through which the Work to be executed by the Subcontractor is described. The Subcontractor may retain one record set of same. Neither the Subcontractor, or any sub-subcontractor, or any material or equipment supplier shall own or claim a copyright in the drawings, specifications and other documents prepared by the Architect, and unless otherwise indicated the Architect shall be deemed the author of them and will retain all common law, statutory and other reserved rights, in addition to the copyright. The drawings, specifications and other documents prepared by the Architect, and copies thereof furnished

to the Subcontractor, are for use solely with respect to this Project. They are not to be used by the Subcontractor, or any sub-subcontractor, or material or equipment supplier on other projects without the specific written consent of the Owner and Architect. The Subcontractor, sub-subcontractors and material or equipment suppliers are granted a limited license to use and reproduce applicable portions of the drawings, specifications and other documents prepared by the Architect appropriate to and for use in the execution of the Work. All copies made under this license shall bear the statutory copyright notice, if any, shown on the drawings, specifications and other documents prepared by the Architect. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's copyright of other reserved rights.

**2.2** The drawings and specifications are intended to supplement one another and any work or materials shown, mentioned or reasonably implied in one and not in the other are to be furnished by the Subcontractor. The enumeration of particular items in this Subcontract or in the specifications shall not be construed to exclude other items shown on the drawings or otherwise required to complete the Work. The intention of the Contract Documents is to include everything, whether specified therein or not, necessary for the proper execution and completion of the Work subject to the satisfaction of PCS, the Architect and the Owner.

## ARTICLE III
### COMMENCEMENT AND COMPLETION OF WORK

3.1 If the progress of contiguous work permits, as determined by PCS, the Subcontractor shall commence all portions of the Work not later than the start dates indicated for each activity on the Subcontractor's Project Schedule contained in the annexed Schedule A (hereinafter the "Schedule"), which, by this reference is incorporated as a part hereof. After the commencement of the Work the Subcontractor shall diligently prosecute the completion of the Work and shall complete each activity on the Schedule within the indicated original duration. Where the dates for the commencement or completion of Work or the making of deliveries are not specified or if said dates are specified but PCS shall require such commencement or deliveries prior to or after the date fixed for such commencement, such Work or deliveries or the part of the same shall be commenced on five (5) days notice from PCS and shall be prosecuted and completed with all possible diligence and speed or as otherwise directed by PCS. The time stated herein for the commencement, prosecution and completion of the Work and the deliveries and installation of material shall be deemed the essence of this Agreement.

3.2 The Schedule may only be modified by PCS, at its sole discretion, and the Subcontractor agrees to comply with such modifications.

3.3 The Subcontractor agrees to cooperate and coordinate with the other subcontractors so as to not interfere with, impede or delay their work. The Subcontractor shall afford all other subcontractors reasonable opportunity for the introduction and storage of their materials and the execution of their work.

3.4 The scheduling of all construction operations at the Project, including the Schedule, shall be at the option of PCS, and the Subcontractor shall, if requested, furnish all scheduling information in such form and detail as requested by PCS, to the satisfaction PCS, and the Subcontractor shall furnish such information within seven (7) days of request. The Subcontractor shall also update and/or revise such information, as requested by PCS, at any time, either prior to or during the performance of its Work.

3.5 The Subcontractor shall coordinate all deliveries of equipment and materials with    PCS. Permission to remove any equipment from the Project must be obtained from PCS.

3.6 The Schedule and any modifications thereto implemented by PCS, or any information submitted by the Subcontractor or others and any scheduling resulting therefrom, shall not constitute the basis of any claim by the Subcontractor or its sub-subcontractors or materialmen for damage or delay, or excuse the Subcontractor's performance as required herein.

3.7 In the event the Subcontractor fails to commence the Work after being notified to do so, or should PCS judge that the Subcontractor is delaying the process of the Work or not complying with the Schedule, or not pursuing the Work in the manner set forth by the drawings, specifications or the other Contract Documents, or in a thorough and workmanlike manner, PCS shall notify the Subcontractor, who shall, within three (3) calendar days thereafter, furnish whatever materials are required by PCS, and employ additional workmen, equipment and supplies, as required, so as to bring the Work into conformity with the Schedule or as required by PCS, or be found in material breach and default of this Agreement, at the option of PCS. The Subcontractor shall, at its sole expense, work overtime, including Saturdays and Sundays, at the direction of PCS, if in the judgment of PCS such overtime and Saturday/Sunday work is necessary to comply with the Schedule due to any delays caused by the Subcontractor or the failure by the Subcontractor to commence its Work timely or the failure by the Subcontractor to be in conformity with the Schedule. The failure of the Subcontractor to comply with said demand shall constitute a material breach and a default of this Agreement, at the option of PCS. The Subcontractor shall be obligated to pay PCS for supervision and any labor and/or expenses related to facilities, safety, security, etc.

3.8 In case of a material breach or default of this Agreement, in addition to any other rights and remedies available to PCS under this Agreement or the other Contract Documents or at law or in quite, (1) PCS shall have the right to retain any and all material left on the premises by the Subcontractor and use same to complete the Work, (2) PCS may furnish any and/or all labor, material, equipment or other subcontractors as may be required to complete

on the premises by the Subcontractor and use same to complete the Work, (2) PCS may furnish any and/or all labor, material, equipment or other subcontractors as may be required to complete the Work, and charge the expense thereof against the Subcontractor and deduct same from this Agreement, and (3) no further payment shall be made to the Subcontractor until all Work under this Agreement is completed. Should, however, the amount of the balance due on this Agreement be insufficient to complete the Work, the Subcontractor shall remain liable for all costs, expenses and damages incurred or suffered by PCS in connection with the completion of the Work, and shall pay same to PCS on demand.

3.9 If the progress of the Work or of the Project is delayed not because of any fault or neglect, act or failure to act on the part of the Subcontractor or any of its officers, agents, servants or employees, or sub-subcontractors, or for any other reason PCS deems appropriate, PCS may direct the Subcontractor to work overtime and if so directed the Subcontractor shall work said overtime and PCS will pay the Subcontractor for such overtime in an amount equal to the actual additional wages paid, if any, at rates which have been approved in writing by PCS, plus taxes and other charges imposed by law on such additional wages required to be paid by the Subcontractor.

## ARTICLE IV
### PRICE AND PAYMENTS

4.1 Subject to the terms herein stated, the sum to be paid by PCS to the Subcontractor for the satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of the Subcontractor under this Agreement and the other Contract Documents is not to exceed $606,535.00 (hereinafter the "Price") subject to additions and deductions as provided by the Contract. The Price includes all Federal, State, County, Municipal and other taxes imposed by law and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used by or levied or assessed with respect to the Work, including but not limited to sales, use and personal property taxes payable by or levied or assessed against the Owner, PCS or the Subcontractor. Where the law requires any such taxes to be stated and charged separately, the total price of all items included in the Work plus the amount of such taxes shall not exceed the Price. Materials incorporated this Contract are tax exempt up to limits and extent allowed by Federal, State, County, Municipal and any other entity having jurisdiction over this project.

4.2 By no later than the 15th of the month, the Subcontractor shall submit to PCS for approval the Subcontractor's "Estimate for Payment," on the forms supplied by PCS, which shall indicate the Subcontractor's estimate of the percentage of completion by the end of that month for each portion of the work performed. PCS shall review the Subcontractor's Estimate for Payment and PCS shall, if required, adjust the percentage of completion to that amount the

Engineer or Owner deems appropriate, therefore determining the value of Work installed to date. A retainage of five (5) percent of all previous payments; all charges for services, material, equipment and other items furnished by PCS to or chargeable to the Subcontractor; and all other retainages and Price reductions indicated in this Agreement shall be deducted from the value of Work installed to date to determine the amount that shall be due and payable as a "Progress Payment" on the 30th of the following month provided, as a condition precedent, that PCS has received payment from the Owner on account of the Subcontractor's Work. In any event, "Progress Payments" shall not become due and payable prior to the 30th of the following month and not less than ten (10) days after PCS receives payment from the Owner on account of the Subcontractor's Work. No Progress Payment or the final payment shall be due and payable to the Subcontractor unless and until the corresponding funds are received by PCS is a condition precedent to PCS's duty to make corresponding payments to the Subcontractor. Request for payment for stored material, if permitted by PCS, shall be the actual and verifiable cost to the Subcontractor (exclusive of overhead and profit) and shall be supported by invoices from the vendor to the Subcontractor and must also be accompanied by insurance certificates naming PCS and the Owner, as the insured, and providing full replacement coverage for the materials against all perils. All such requests for stored material, on and off the Premises, must be accompanied by a sworn notarized statement of the Subcontractor that the materials are for installation in the Project only, that the materials strictly comply with the requirements of the Contract Documents and that the materials have been segregated and shall be labeled as property of PCS, upon payment therefore. Unless otherwise specified, a retainage of twenty-five (25) percent will be withheld from payments for stored material. The Subcontractor agrees that if and when requested to do so by PCS, it shall furnish copies of any and all subcontracts and purchase orders to vendors, for material and equipment to be installed as part of the Work. The Subcontractor agrees that if and when requested to do so by PCS, it shall furnish such additional information, evidence and substantiation as PCS may require with respect to the nature and extent of all obligations incurred by the Subcontractor for or in connection with the Work, all payments made by the Subcontractor thereon, and the amount remaining unpaid, to whom, and the reasons therefore. If the Subcontractor's Estimate for Payment is received by PCS after the 15th of the month, it will not be included in PCS's invoice to the Owner and therefore, will not be recognized as being received until the 15th of the following month.

4.3 The Subcontractor agrees, that as a condition precedent to entitlement to any payment, the Subcontractor shall execute and submit to PCS by the fifteenth of the month after a Progress Payment is received, a "Subcontractor's Release and Waiver of Lien and a "Subcontractor's Affidavit of Payment" on forms supplied by PCS with respect to all Work for which PCS has made payment pursuant to the approved Schedule of Values. In addition, for subcontracts with a price in excess of One Hundred Thousand



MAJOR subcontractors and vendors (as determined by PCS) a "Subcontractor Vendor Statement of Account". It is expressly understood that failure on the part of the Subcontractor to comply with the above will result in the withholding or issuance of Progress Payments until compliance is ascertained. The Subcontractor further agrees that it shall, as a condition precedent to entitlement to any payment, furnish to PCS waivers of lien, releases or any other documentation required by PCS executed by itself and all suppliers, materialmen, laborers or subcontractors or anyone furnishing labor or materials for the Work.

4.4 Payment of the retainage withheld pursuant to Paragraph 4.3 shall be due within sixty (60) days after completion and acceptance of the Work by PCS, the Architect and the Owner, provided first however, as a condition precedent, that (1) PCS shall receive and approve the Subcontractor's "Estimate for Payment" indicating that the Work has been completed and requesting the payment of the retainage, (2) PCS shall have received all funds for the Work performed under this Agreement from the Owner, (3) the Subcontractor shall have furnished evidence satisfactory to PCS, including but not limited to releases and waiver of liens that there are no claims, obligations or liens outstanding or unsatisfied for labor, services, materials, equipment, taxes or other items performed, furnished or incurred for or in connection with the Work, (4) the Subcontractor shall have executed and delivered to PCS a General Release and Release of Liens for itself and all of its subcontractors, suppliers, material men and laborers on a form provided by PCS, running to and in favor of PCS and the Owner, (5) the Subcontractor shall have submitted to PCS, in a format that is satisfactory to PCS and the Architect, all as-built drawings, maintenance manuals, operations manuals, attic stock, spare parts, warranties, guarantees, material certificates, labor certificates, testing and inspection reports and alike required by the Contract Documents, and (6) the Subcontractor shall have furnished to PCS a consent to final payment executed by the Subcontractor's Surety. Should there prove to be any such claim, obligation or lien after final payment is made, the Subcontractor shall immediately upon demand, make payment for, or refund to PCS all monies that PCS and/or the Owner shall have paid in satisfying, discharging or defending against any such claim, obligation or lien or any action brought or judgment recovered thereon and all costs and expenses, including legal fees and disbursements, incurred in connection therewith.

4.5 If any claim or lien is made or filed on or against PCS, the Owner, the Project or the Premises by any person claiming that the Subcontractor or any sub-subcontractor or other person under it has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work, or if at any time there shall be evidence of such nonpayment of any claim o r lien for which, if established, PCS or the Owner might become liable and which is chargeable to the Subcontractor, or if the sub-subcontractor or any subcontractor or other person under it causes damage to the Work

or to any other work on the Project, or if the Subcontractor fails to perform or is otherwise in default under any of the terms or provisions of this Agreement or the other Contract Documents, PCS shall have the right to retain from any payment then due or thereafter to become due the Subcontractor an amount which it deems sufficient to (1) satisfy, discharge and/or defend against any such claim or lien or any action which may be brought or judgment which may be recovered thereon, (2) make good any such nonpayment, damage, failure, default, and (3) compensate PCS and the Owner for any and all losses, liability, damages, costs and expenses including legal fees and disbursements, which may be sustained or incurred by either or both of them in connection therewith, and the Subcontractor shall indemnify, defend, and hold harmless PCS and the Owner against the same. PCS shall have the right to apply and charge against the Subcontractor so much of the amount retained as may be required for the foregoing purposes. If the amount retained is insufficient therefore, the Subcontractor shall be liable for the difference and immediately upon notice pay the same to PCS.

4.6 NO PAYMENT (FINAL OR OTHERWISE) MADE UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONCLUSIVE EVIDENCE OF THE PERFORMANCE OF THE WORK OR OF THIS AGREEMENT, IN WHOLE OR IN PART, AND NO SUCH PAYMENT SHALL RELEASE THE SUBCONTRACTOR FROM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT; NOR SHALL ENTRANCE AND/OR USE BY THE OWNER CONSTITUTE ACCEPTANCE OF THE WORK OR ANY PART THEREOF.


4.7 The acceptance by the subcontractor of any payment made after receipt by PCS of its payment of any part thereof from the owner, shall be and operate as a release to PCS of all claims and all liabilities to the Subcontractor for all things done or furnished or relating to the Work, and for every act of alleged neglect of PCS arising out of this Subcontract, excepting only claims for retained percentages withheld by PCS as provided for herein.

### *ARTICLE V*
DELAYS, EXTENSIONS OF TIME, ETC.

5.1 The Subcontractor agrees that if it does not perform the Work in accordance with the Schedule or if it shall otherwise delay the progress of the Work so as to cause damage, of whatsoever kind or nature for which PCS or the Owner shall suffer or become liable, the Subcontractor shall make good to PCS any such damages or costs (including legal fees and disbursements) and indemnify, defend, and save PCS and the Owner harmless from the same. Any assent or permission of PCS to the delayed finishing of the Work shall not be construed as a waiver of this Agreement to make good any damage
caused by such delay or default, nor shall it be a forfeiture of such damages.

5.2 In the event the Work of the Subcontractor is damaged, or should the Work of the Subcontractor be delayed or interfered with by any other subcontractor or material supplier on the Project, the Subcontractor and each such subcontractor or material supplier shall be directly responsible to the other, each shall look solely to the other for compensation, and the Subcontractor will not seek compensation or damages from PCS, by reason thereof.

5.3 Should the Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the Work because of conditions not attributable to the Subcontractor and which by the terms of the Contract may be grounds for an extension of time, it shall, in full and complete compensation for said delay and as its sole remedy, within twenty-four (24) hours thereafter, make claim to PCS in writing, for any extension of time, and PCS may award and certify the amount of additional time to be allowed, if any. If the Subcontractor fails to furnish to PCS written notice in accordance with this paragraph, the Subcontractor agrees that it has waived any right to any such extension of time.

5.4 The Subcontractor acknowledges that the Price is based on the fact that PCS or the Owner is not liable, absent actual fraud, for any damages or costs due to delays, accelerations, impact, non-performance, interferences with performance, suspension or changes in the performance or sequence of the Subcontractor's Work, even if PCS wrongfully denies an extension of time to the Subcontractor. Thus in no event, absent actual fraud, shall PCS or the Owner be liable to the Subcontractor for any damages caused by delay, acceleration, interferences, suspension, non-performance, or changes in the sequence of performance or impact upon, or with, the Work of the Subcontractor. PCS or the Owner shall have the right, at any time, to delay, accelerate or suspend the commencement or execution of the whole or any part of the Work, or vary the sequence or performance thereof, without compensation to the Subcontractor other than extending the time for completing the Subcontractor's Work for a period equal to such delay or suspension. The Schedule may from time to time be modified to conform to acceleration, delays, suspensions or variances and the Subcontract shall conform its progress thereto. No allowances for time will be made to the Subcontractor for delay in preparing its submittals or in securing approval of the Architect when such submittals are not properly prepared for approval of the Architect.

5.5 In addition to the foregoing provisions of this Article, and not in limitation thereof, it is understood that, at the time of the execution of this Subcontract, the parties hereto are aware of the possibility of increases in the prices of labor or materials necessary to perform this Subcontract and/or the difficulty in obtaining same. It is accordingly understood that no claim shall be made by the Subcontractor for any increase in the Price herein even though it may be necessary to obtain materials from local warehouse stocks or otherwise in order to perform within the time required by PCS. The Subcontractor shall at no time claim that the Price was predicated on obtaining materials from any particular source of

supply. If it be thereafter claimed that the Subcontractor finds that the price of labor and materials herein provided for has increased to any extent, for any reason whatsoever, including (but without limiting the generality of the source or causes of such possible increases) strikes, forced or voluntary agreements between employer and employee, present or future Federal, State, County or Municipal regulations, enactments, statutes, decrees, present or future codes, trade association agreements; whether the same be brought by statute, agreement or otherwise, freight rates, or any change of economic conditions whatsoever, it is understood that any and all risks of increase in the price of labor and materials have been contemplated by the Subcontractor and have been taken into full consideration in arriving at the Price. The Subcontractor shall at no time claim such increase against PCS even though the Subcontractor had been brought into a period of increased labor and material cost by reason of delays of PCS, any of its other Subcontractors, the Owner or its representatives, or other independent contractors employed by the Owner, or for any cause whatsoever.

5.6 Should concealed conditions be encountered in the performance of the Work below the surface of the ground, or should concealed or unknown conditions be at variance with the conditions indicated or depicted by the Contract Documents, or should unknown physical conditions exist below the surface of the ground or should concealed or unknown conditions in an existing structure of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the Work of the character provided for in this Agreement, be encountered, the Subcontractor shall remain obligated to continue to perform the Work in accordance with the terms of this Agreement and shall not be entitled to an extension of contract time and shall not be entitled to payment of any additional sums to perform the Work notwithstanding the existence of such conditions, as the Subcontractor specifically assumes the risk of encountering any and all such concealed conditions. With exception that conditions deemed to be additional work by the Owner, and paid as additional work by the Owner, will be considered and compensated but only up to the limit of the additional amount actually paid by the Owner to PCS for the excepting condition.

## ARTICLE VI
### FREIGHT CHARGES AND SHIPMENT

The Subcontractor in making or ordering shipments shall not consign or have consigned materials, equipment or any other items in the name of PCS. PCS is under no obligation to make payment for charges on shipments made by or to the Subcontractor but may, at its option, pay such charges, in which case the Subcontractor shall immediately upon presentation for payment reimburse PCS for the amount of such payment plus a service charge of twenty-five (25) percent of the amount paid.

## ARTICLE VII
SUBMITTALS, DIMENISIONG AND CONTINGUOUS WORK

7.1 Notwithstanding the dimensions given on the drawings, specifications and other Contract Documents it shall be the obligation and responsibility of the Subcontractor to coordinate and install the Work to clear all obstructions, permit proper clearances for contiguous work and present an orderly appearance where exposed, subject to the approval of PCS and the Architect. The Subcontractor shall also take such field measurements as will insure the proper matching and fitting of the Work with contiguous work.

7.2 Because the Schedule does not allow for the resubmission of any shop drawings, product data, sample or similar submittals, the Subcontractor agrees to ensure that the Subcontractor's first submissions shall comply with all the requirements of the Contract Documents. It is further agreed that if, for whatever reason, any shop drawing, project data, samples and similar submittals require more than one resubmission to secure the approval of PCS and/or the Architect. The Subcontractor agrees to remedy any delay, for any reason, resulting from any shop drawing, product data, sample or similar submittal not being approved by PCS and/or the Architect in accordance with the requirements of the Schedule.

7.3 The Subcontractor shall direct specific attention, in writing or on resubmitted shop drawings, product data, samples or similar submittals, to revisions other than those requested by PCS or the Architect on previous submittals. Unless such written notice has been given, PCS or the Architect's approval of a resubmitted shop drawing, product data, sample or similar submittal shall not constitute approval of any changes not requested on the prior submittal.

7.4 When professional certification of performance criteria of materials, systems or equipment is required by the Contract Documents, the Owner, PCS and the Architect shall be entitled to rely upon such certifications, and neither the Owner, PCS nor the Architect shall be expected to make any independent examination with respect thereto.

7.5 Although the coordination of this Work with contiguous work is the sole responsibility of the Subcontractor, the Subcontractor will prepare all coordination drawings, showing exact alignment, physical location and conformation of certain portions of the Work and participate in all coordination meetings, as directed by PCS.

7.6 All manufactured articles, materials, and equipment shall be applied, installed, connected, erected, used, cleaned, and conditioned in accordance with the manufacturer's written or printed directions and instructions unless otherwise indicated in the Contract Documents.

7.7 The Subcontractor agrees that all materials, products, processes or systems named in the specifications or on the drawings will be utilized for the Work. If the specifications permit an "or equal" or if the Subcontractor wishes to submit a substitution,

the Subcontractor must, in both cases submit a "Request for Substitution" on the PCS form for approval. The approval of any "or equal" or a substitution is at the sole and exclusive discretion of PCS and the Architect. If PCS and the Architect do approve such a Request for Substitution, the Subcontractor is solely responsible for any and all resulting additional costs to the Project.

7.8 Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, the Subcontractor shall carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover and report any defects to PCS in writing and allow PCS a reasonable time to have such improper conditions and defects remedied. Upon the commencement of such Work by the Subcontractor, the Subcontractor shall have conclusively accepted such contiguous work as fit, ready and in a condition suitable and, sufficient for the proper and accurate performance of the Work hereunder.

7.9 The Subcontractor will perform all cutting, fitting or patching required to complete the Work. The Subcontractor will not, however, commence with cutting or modifying contiguous work unless PCS approves such cutting or modifying.

7.10 The Subcontractor will provide all layout and engineering work required for the Work beyond two (2) axis lines and one (1) bench mark provided by PCS on grade.

## ARTICLE VIII

### INTERPRETATION OF DRAWINGS AND SPECIFICATIONS

8.1 In the interest of brevity the drawings and specifications frequently omit modifying words such as "all" and "any" and articles such as "the" and "an" but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

8.2 All indications or notations on the drawings and specifications which apply to one of a number of similar situations, materials or processes shall be deemed to apply to all such situations, materials or processes wherever they appear in the Work, except where a contrary result is clearly indicated by the Contract Documents.

8.3 Interpretations requested by the Subcontractor for the proper execution or progress of the Work, in the form of drawings or otherwise, will be requested by the Subcontractor in writing, using the PCS Request for Information Forms, and the response will be issued by PCS in writing. Such interpretations which are consistent with the intent of and/or reasonably inferable from the Contract Documents shall not serve as a basis for a claim of a change in the Schedule or the Price by the Subcontractor. The Subcontractor shall not make any changes, additions and/or deletions in the Work

except upon written order of PCS as provided in Article IX hereof.

8.4 The Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the Architect and PCS. The decision of the Architect as to the true construction, meaning and intent of the drawings and specifications shall be final and binding upon the parties hereto. PCS will furnish to the Subcontractor such additional information and drawings as may be prepared by the Architect to further describe the Work to be performed and furnished by the Subcontractor and the Subcontractor shall conform to and abide by the same.

*8.5* Where codes, standards, requirements and publications of public and private bodies are referred to in the Contract Documents, references shall be understood to be to the latest revision.

## ARTICLE IX
### CHANGE IN THE WORK

9.1 PCS reserves the right, at any time whatsoever, whether the Work or any part thereof shall or shall not have been completed, to make changes, additions and/or deletions in the Work as it may deem necessary upon written order (Change Order or Field Directive) to the Subcontractor. The Subcontractor acknowledges and agrees that it shall make no claim for extra or additional compensation on account of any such work, unless same shall have been done pursuant to a written order, signed by the representative designated by PCS as having the authority to order such extra work.

9.2 Should the Subcontractor receive a Bulletin, or Pricing Request, the Subcontractor shall submit a totally inclusive Proposal to perform the changes, additions and/or deletions in the Work. The Subcontractor's proposal must be submitted within seven 7) days of receipt of a Bulletin or Pricing Request from PCS. It is agreed that if the Subcontractor does not submit such proposal within seven (7) days, then PCS may estimate the value of work to be performed by the Subcontractor and the Subcontractor will execute a Change Order for PCS's estimated value of work, if so directed by PCS

9.3 In the event that PCS directs the Subcontractor to perform any item of work, which the Subcontractor claims involves extra or additional work that has not been authorized by a Change Order or Field Directive, the Subcontractor shall, within three (3) days after receipt of such direction, and before proceeding therewith, make written claim to PCS, giving in detail the basis of its contention that the work is extra or additional, together with a detailed breakdown showing separately the additional cost of each item of labor and material. The Subcontractor shall then proceed with this work. A failure to make written notice of claim within the time specified, and in the manner as herein provided, shall constitute a waiver of such claim and no recovery may be had by the Subcontractor, on account of such work. The failure of the Subcontractor to perform

this work, immediately after giving written notice of its claim, or on the fourth day subsequent to being directed to perform this work, whichever is less, shall constitute a material breach of this Agreement, regardless of the legitimacy of the Subcontractor's contentions, as it is specifically understood and agreed that the progress of the Work may not be delayed by reason of any controversy between the parties.

9.4 The amount to be paid to the Subcontractor on account of any extra, changed, added omitted work shall be:

(A) An agreed upon lump sum price, or at the sole option of PCS

(B) Unit Prices or Alternates, or at the sole option of PCS

(C) A time and material basis computed as follows:

(i) On the basis of actual or estimated costs, whichever is less, of labor and material, (hereafter called "Costs of the Work") where such Costs of the Work shall be completely itemized showing quantities for each. Wage benefits, taxes, and insurances, shall be computed and shown separately as well as sales tax if applicable. Overhead often (10) percent and profit of five (5) percent shall be computed on the Costs of the Work subtotal, and shown separately. The overhead cost often (10) percent shall be in lieu of all administration, clerical expense, supervision, or superintendent of any nature whatsoever, including foremen, or the cost, use or rental of tools or plant.

(ii) On the basis of actual or estimated costs, whichever is less, for work performed by a sub-subcontractor where the sub-subcontractor's costs shall be completely itemized showing quantities for each. The sub-subcontractor shall be allowed overhead and profit which amount in total shall not exceed fifteen (15) percent of such cost, which shall be itemized separately and the Subcontractor shall be allowed overhead and profit which amount in total shall not exceed five (5) percent of such costs. The same limitations on all overhead cost as provided in C (I) shall apply herein.

(iii) If PCS determines that the actual cost is to be used to compute the value of extra work, the Subcontractor shall submit daily time and material tickets, on each day that the changed work is performed to PCS's authorized representative for verification. The failure of the Subcontractor to submit any daily ticket shall constitute a waiver of its entitlement to payment for such day and invoices submitted without verified daily tickets shall not constitute a valid basis for payment.

9.5 With respect to any item of work referred to in Paragraph 9.3, for which PCS has received the Subcontractor's written notice of its claim or any proposal referred to in Paragraph 9.2 for which the Subcontractor and PCS cannot agree upon the amount to be paid to the Subcontractor, PCS may submit same to the Owner for his determination. The Subcontractor agrees to be bound by the determination of the Owner and will accept such payment, if any, as

determination. The Subcontractor agrees to be bound by the determination of the Owner and will accept such payment, if any, as specified by the Owner as full and final payment for all claims submitted. Should the Owner determine that the work is not an extra, or awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and payment as payment in full. PCS, however, at its sole and exclusive discretion, may appeal from any ruling or may institute suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the work of the Subcontractor. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to PCS, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by PCS in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to PCS and all expenses and attorneys fees and disbursements incurred by PCS in prosecuting such appeal or suit. The Subcontractor agrees that no claim, invoice or "Estimate for Payment" shall include any modifications to the Price, without an executed Change Order, pursuant to which such work is eligible for payment.

9.6 Where any additional work is ordered, the Subcontractor shall for such purposes, permit PCS to audit its books. The Subcontractor shall produce any and all data which PCS may request for the purpose of determining the correctness of the charges. The Subcontractor shall keep such full and detailed accounts as may be necessary to reflect its operations with respect to such changes and extras, and the system adopted shall be such as is satisfactory to PCS and its agents and employees shall be afforded access at all reasonable time to the Subcontractor's and vendor's books, correspondence, instructions, receipts, vouchers, memoranda and records of all kinds, relating to all Work under this Subcontract as well as to such changes and extras, and the Subcontractor shall preserve the same for a period of two years after final payment hereunder. In regard to the foregoing and generally, the Subcontractor hereby authorizes PCS to check directly with its suppliers of labor and materials regarding the charges for such labor, materials and other items appearing in the Subcontractor's bills rendered to PCS, to confirm balances due and obtain sworn statements and waivers of lien.

9.7 In no event shall the terms of this Article impair or modify in any manner, or extend the liability of PCS to the Subcontractor, as set forth in Article V of this Agreement.

9.8 Where any additional work is ordered and a Change Order or Field Directive shall have been executed by the Subcontractor, such additional work shall be deemed to be a part of the Work as defined in this Subcontract.

**_ARTICLE X_**

## INSPECTION, TESTING AND DEFECTIVE WORK

10.1 The Subcontractor shall at all times provide sufficient, safe and proper facilities for the inspection of the Work by PCS, the Architect and their authorized representatives in the field, at shops, or any other place where materials or equipment for the Work are in the course of preparation, manufacture, treatment or storage.

10.2 When the Contract Documents require the Subcontractor to perform inspections and/or testing, the Subcontractor shall submit the inspection and/or testing methods, procedures and reporting forms to PCS for approval, at least twenty days in advance of when the inspection and/or testing is required.

10.3 When the Contract Documents require the Subcontractor to use an independent testing agency the Subcontractor shall submit the professional credentials of said agency to PCS for approval, at least twenty days in advance of when the inspection and/or testing is required.

10.4 The Subcontractor shall give PCS timely notice of when and where inspection and/or testing will be performed by the Subcontractor or by its independent testing agency, so that PCS, the Architect and/or the Owner may observe same. Any such observation by PCS, the Architect and/or the Owner shall not diminish, in any way, the Subcontractor's responsibility to perform the Work in accordance with the Contract Documents

10.5 The Subcontractor shall, within twenty-four (24) hours after receiving written notice from PCS of any defective work, proceed to take down all portions of the Work and remove from the Premises all materials whether worked or unworked, which the Architect or PCS shall condemn as unsound, defective or improper or in any way failing to conform to this Agreement or the drawings, specifications or other Contract Documents, and the Subcontractor, at its own cost and expense shall replace the same with proper and satisfactory work and materials and make good all Work damaged or destroyed by or as a result of such unsound, defective, improper or nonconforming Work or materials or by the taking down, removal or replacement thereof, and pay to PCS the cost of any testing that was used to determine that the Work was defective, as well as any associated costs of services or expenses of PCS and/or the Architect. Removal and replacement by the Subcontractor as aforementioned shall constitute the Subcontractor's acknowledgment that the portion of the Work removed was unsound, defective or improper or otherwise failed to conform to the Contract Documents.


## ARTICLE XI
## DEFAULT

11.1 Should the Subcontractor at any time refuse or neglect to supply sufficient skilled workmen or materials of the proper quality and quantity to fulfill, at a minimum, the requirements of the Schedule, or fail in any respect to prosecute the Work with the

outmost promptness and diligence, or cause by any act or omission the stoppage or delay of or interference with or damage to its own Work or the work of PCS or of any other subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents, or should PCS or the Architect determine that the Work or any portion thereof is not being performed in accordance with the Contract Documents, then in any of such events, each of which shall constitute a default hereunder on the Subcontractor's part, PCS shall have the right, in addition to any other rights and remedies otherwise provided by this Agreement and the other Contract Documents, or by law or in equity, after three (3) days written notice to the Subcontractor, (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the Premises and take possession for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to PCS for and until the completion of such Work, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefore. In case of such termination of the employment of Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of PCS and the Architect and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by PCS in completing the Work, such excess shall be paid by PCS to the Subcontractor; but if such cost and expense shall exceed such unpaid balance, then Subcontractor shall immediately upon receipt of notice of the amount thereof pay the difference to PCS, such cost and expense shall include, the cost of completing the Work to the satisfaction of PCS, the Owner and the Architect, and of performing and furnishing all labor, services, materials, equipment, and other items required therefore; a reasonable charge for PCS's overhead; and all losses, damages, costs and expenses, including legal fees and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default.

### ARTICLE XII
#### LOSS OR DAMAGE TO WORK

12.1 Neither the Owner nor PCS shall be responsible for any loss or damage to the Work to be performance and furnished under this Agreement, however caused, until after final acceptance thereof by PCS and the Owner, nor shall PCS or the Owner be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the

Work, however caused. Regardless of the provisions of the Contract or Contract Documents, PCS will not be required to provide any watchman service or other security for the protection of the Subcontractor and will not, in any manner, be answerable or accountable for any loss or damage, including theft, that shall or may happen to the Work, or any part or parts thereof, or any of the materials or other things used or employed in finishing or completing the Work.

12.2 PCS or the Owner, if provided in the Contract Documents, shall effect and maintain fire insurance (with extended coverage, if specified or otherwise required) upon all work, materials and equipment incorporated in the Project and all materials and equipment on or about the Premises intended for permanent use or incorporation in the Project or incident to the construction thereof, the capital value of which is included in the Cost of the Work, but not including any machinery, tools, equipment, appliances or other property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work. The total value of the property insurable under this paragraph shall be the value of Work installed to date, as determined by the Approved Estimate of Payment provided for in Article IV, plus the total value of similar property incorporated in the Project or delivered on the Premises by or on behalf of the Subcontractor during the month but not included in said approved Estimate of Payment, as reported by the Subcontractor to PCS for insurance purposes only. The maximum liability to the Subcontractor under such insurance shall be for no more than that proportion of any loss which the last reported value of the Subcontractor's insured property bore to the actual value of said property at the time of such last report, and in no event for more than the actual loss. In the event of a loss under this paragraph, the Subcontractor shall be responsible to pay all applicable deductibles and the Subcontractor shall be bound by any adjustment which shall be made between PCS or the Owner and the insurance company or companies. Loss, if any, shall be made payable to PCS and/or the Owner, as their interests may appear, for the account of whom it may concern.

## **ARTICLE XIII**

## *CLEANING UP*

13.1 The Subcontractor shall on a daily basis or less frequently, in the sole discretion of PCS, and at the Subcontractor's own cost and expense, (1) keep the area of the Premises in which the Work is being performed clean at all times from all waste materials, packaging materials and other rubbish accumulated in connection with the execution of the Work by collecting and depositing daily said material and rubbish into dumpsters provided on grade by PCS, (2) clean and remove from its own Work and from all

contiguous work of others any soiling, staining, mortar, plaster, concrete or dirt caused by the execution of the Work and make good all defects resulting therefrom, (3) at the completion of its Work in each area, perform such cleaning as may be required to leave the area "broom clean" and (4) upon the completion of the Work, remove all of its tools, equipment, scaffolds, shanties, trailers and surplus materials. Should the Subcontractor fail to perform any of the foregoing to Skull's satisfaction, PCS shall have the right after notice (written or oral) to perform and complete such work itself or through others and deduct the cost thereof from payments due the Subcontractor.

## *ARTICLE XIV*

### *COMPLIANCE WITH LAW AND PERMITS*

14.1 The Subcontractor shall obtain and pay for necessary permits and licenses pertaining to the Work and shall comply with all Federal, State, County and Municipal laws, ordinances, rules, regulations, orders, notices and requirements, including, among others, those relating to safety, discrimination in employment, fair employment practices or equal employment opportunity, and with the requirements of the American Insurance Association, whether or not provided for by the drawings, specifications or other Contract Documents, without additional charge or expense to PCS and shall also be responsible to correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of the Work. The Subcontractor shall at any time upon demand furnish such proof as PCS may require showing such compliance and the correction of such violations. The Subcontractor agrees to save harmless, defend, and indemnify PCS and the Architect from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor's failure to comply with any of said laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct such violations.

14.2 Where the Contract Documents or any part thereof, conflict with laws, codes, ordinances, rules, regulations, orders, notices or requirements (collectively Laws), it is intended that Laws be followed. The Subcontractor shall at once report to PCS any inconsistency with any Laws prior to proceeding.

14.3 The Subcontractor shall promptly notify PCS and any respective departments, or official bodies, when its Work is ready for inspection and shall, at once, do all work required to remove any violations or to comply with such inspections, without additional charge to PCS. The Subcontractor shall perform all work necessary to obtain approval from all authorities and agencies without additional cost to PCS or the Owner.

14.4 The Subcontractor shall comply with "The Hazard Communications Standard 29" CFR 1910.1200 (29 CFR 1926.59)

including but not limited to: furnishing to PCS within (15) fifteen days of the Subcontract date the Material Data Safety Sheets (M.D.S.S.) for any hazardous material or chemicals used by the Subcontractor for this Project: training the Subcontractor's employees in the proper use of such hazardous materials or chemicals, (the Subcontractor must have a written Hazardous Communication Training Program for its' employees as per 29 CFR 1926.59); and all chemicals used by the Subcontractor on this project must have a manufacturers' label on the container and the labels must not be removed (the Subcontractor warrants that all container labels accurately portray the chemicals contained.)

14.5  The Subcontractor will notify PCS of any and all hazardous material (as defined by OSHA or any State or local law, code or regulation) being brought to or stored at the Project five (5) days before same arrives at the premises and the length of time the material will remain at the project and the manner in which it will be used and applied; so that all personnel on the premises can be notified.

### ARTICLE XV

*LABOR, MATERIALS AND EQUIPMENT*

15.1 The Subcontractor shall not employ persons, means and materials or equipment which or whose presence or performance on or at the Premises is likely to cause strikes, work stoppages or nay disturbances by workmen employed by the Subcontractor, PCS or other Subcontractors, on or in connection with any Work on the Project. The subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional dispute which may be in affect in the locality in which work is being done and that shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this Article shall not be in violation or conflict with any provisions of law applicable to the settlement of such disputes. Should the Subcontractor fail to carry out or comply with any foregoing provisions, PCS shall have the right, in addition to any other rights and remedies provided by this Agreement and the other Contract Documents or by the Laws, after three (3) days written notice mailed or delivered to the last known address of the Subcontractor, to terminate this Agreement or any part thereof or the employment of the Subcontractor for all or any portion of the Work, and, for this purpose of completing the Work, to enter upon the Premises and take possession, in the same matter, to the same extent, and upon the same terms and conditions set forth in Article XI of this Agreement.

15.2 All Municipal, County, State and Federal anti-discrimination and right to work laws will be observed by the Subcontractor in the employment of all personnel at the Project. The subcontractor also agrees that during the performance of this Subcontract:

A) The subcontractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Subcontractor will take affirmitative action to ensure that applicants are employed, and that employees are treated fair during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following:

Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Subcontractor agrees to post in conspicuous places, available to employees and applicants for employment, notices setting fourth the provisions of this non-discrimination clause.

B) The Subcontractor will, in all solicitations or advertisements for employees placed by or on behalf of the Subcontractor, state that all qualified applicants shall receive consideration for employment without regard to race, color, religion, sex or national origin.

C) The Subcontractor shall will send to each labor union or representative of workers' with which he has a collective bargaining agreement or other contracts or understanding, a notice advertising the labor union or workers representative of the Subcontractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of notice in conspicuous places available to employees and applicants for employment.

D) The Subcontractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965 and of the rules, regulations, and relevant orders of the Secretary of Labor. The Subcontractor will furnish all information and reports required by City of New York or the Secretary of Labor, or pursuant hereto, and will permit access to his books, records and accounts by above named for purposes of investigation to ascertain compliance with such rules, regulations and orders.

E) In the event of the Subcontractor's non-compliance with the non-discrimination clauses of this subcontract or with any of such rules, regulations and orders, this Subcontract may be canceled, terminated, or suspended in whole or in part.

15.3 The Subcontractor agrees that this Agreement includes all work that under the jurisdiction of the trades employed by the Subcontractor to perform the Work.

15.4 The Work is to be done in the best manner and by persons skilled in the type of work to be performed. The Subcontractor shall give the Work constant attention and supervision through a responsible representative or superintendent, and any necessary assistants, and if directed by PCS, this representative shall attend any meeting and be stationed full time on the Premises. Such representative shall be authorized to act for the Subcontractor in all matters relating to the Work, and all directions given him shall be as binding as if given to the Subcontractor. If any of the Subcontractor's representatives fail to attend any meeting scheduled by PCS, the subcontractor agrees to reduce the Price by $250 for each such attendance failure by the Subcontractor. The subcontractor shall also keep a competent foreman at the Project while work is in progress, and enforce strict discipline among it's employees, including compliance with a Site Logistics Plan, The Orientation and Procedures for Subcontractor Personnel and any other regulations PCS may institute.

15.5 PCS has the right, at its sole discretion, to require the Subcontractor to remove immediately any employee, sub-contractor, vendor or agent of the Subcontractor, employed at the Project whom PCS deems to be under the influence of illegal drugs and/ or alcohol, incompetent or a hindrance to the proper progress of the Work, and such person shall not again be employed on the Project without proper written consent of PCS.

15.6 All materials and equipment are to be new, free from defects and faults, and in conformance with the Contract Documents; and the Subcontractor shall furnish evidence thereof as directed and to the satisfaction of PCS and the Architect. The Subcontractor shall obtain the manufacturers written recommendation that the material and equipment is designed and appropriate for the use intended and shall furnish guarantees where such can be obtained. Such materials and equipment shall not be subject to any conditional bill of sale, security agreement, financing statement, chattel mortgage, or any other claim, lien or encumbrance. The Subcontractor shall, if required by PCS, cause the materials (1) to be manufactured in advance, (2) to be warehoused either at the factory or elsewhere as directed by PCS, (3) to be delivered to the Project promptly when so instructed by PCS and (4) to be relocated or removed from the Project at the cost of the Subcontractor. Care must be exercised by the Subcontractor against overloading any parts of floors, roofs, scaffolding and other installations. All materials delivered to the project which are to form a part of the Work herein specified shall not be removed without the consent of PCS, but the Subcontractor will have the right to and shall remove all its surplus materials after completion of the Work provided such material was not originally provided by PCS for the Subcontractor's safekeeping and

installation.

15.7 Storage of material and equipment at the Premises shall be permitted only to the extent approval in advance by PCS. If any stored material or equipment obstructs the progress of any portion of work, it shall be promptly removed or relocated by the Subcontractor as directed by PCS. Facilities for storage at the premises may be limited and it shall be the Subcontractor's responsibility to make whatever arrangements are necessary to insure proper material and equipment availability to maintain the Schedule.

15.8 When material and equipment are furnished by others for installation by the Subcontractor, the Subcontractor shall be responsible for receiving, unloading, storing, handling, protecting, relocating, hoisting, distributing, laying out and installing the material and equipment. The Subcontractor shall be responsible for the protection, maintenance, custody and control of the material and equipment from the time of delivery to the Premises until acceptance by the Owner.

### *Article XVI*

*TAXES AND CONTRIBUTIONS*

16.1 The Subcontractor for the Price herein provided for, hereby accepts and assumes exclusive liability for and shall indemnify, defend, protect and save harmless PCS and the Owner from and against the payment of: all contributions, taxes, or premiums (including interest and penalties theron) which may be payable under the Unemployment Insurance Law of any State, the Federal Social Security Act, Federal, State, County and/or Municipal Tax withholding laws, or any other laws, measured upon the payroll of or required to be withheld from employees, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement; and

    A) all sales, use, personal property and other taxes (including interest and penalties thereon) required by any Federal, State, County and Municipal law to be paid or collected by the Subcontractor or any of its subcontractors or vendors or any other person or persons acting for, thorough or under it or any of them, by reason of the performance of the work or the acquisition, ownership, furnishing or use of any materials, equipment, supplies, labor, services, or other work items for or in connection with the Work;

    B) all pension, welfare, vacation, annuity, and other union benefit contributions payable under or in connection with labor agreements with respect to all persons, by whomsoever employed, engaged in the Work to be

performed and furnished under this Agreement; and

C) the Subcontractor's proportionate share of any and all other taxes imposed by an government body as a consequence of PCS's performance of the Contract other than Federal, State, County and Municipal Income Taxes.

## *ARTICLE XVII*

### *MECHANICS LEINS*

18.1 The Subcontractor and Contractor acknowledge that there is a risk that the Owner, in breach of its obligations to the Contractor, may make late payments or may, under certain circumstances such as insolvency, not make required payments to the Contractor. As a consequence of the foregoing, and consistent with the parties allocation of risk under this Agreement, the Subcontractor agrees that the Contractor's receipt of payment from the Owner on behalf of the work of the Subcontractor and its requisitions for payment (weather interim requisitions or the final requisition including retainage) shall be, to the fullest extent allowed by law, a condition precedent to the Subcontractor's right to receive payment from Contractor. In the event that the Contractor has not received payment from the Owner on account of the work of the Subcontractor, Contractor may, in its sole discretion, assign to the Subcontractor, the rights of the Contractor to pursue claims against the Owner for the payment due to the Contractor on behalf of the work performed by the Subcontractor, which assignment the Subcontractor must accept in full and complete liquidation of Contractor's payment obligations to Subcontractor. The parties further acknowledge that notwithstanding the condition precedent payment protection afforded to the Contractor by this Agreement, the Subcontractors entitled to pursue any and all rights it has under the Lien Law of the State of New York (Lien Law) in the event that the Subcontractor is not paid the amounts earned under this Agreement; and that for sole purpose of ascertaining the date upon which payment is due to Subcontractor under the Lien Law, it shall be the date upon which payment would be due if the Contractor was timely paid by the Owner on account of the Subcontractor's unpaid requisition(s) for payment. To the extent that the provisions of this Article are inconsistent with any rights under the Lien Law, the provisions of this Article shall be affected only with respect to those matters which protect the Subcontractor's right to maintain and enforce a Mechanics Lien against the Project. The Subcontractor agrees that its filing of a Mechanic's Lien in full accordance with the Lien Law and its prosecution of its Mechanic Lien claim in a court of law, and its collection, if any, of any such judgment upon foreclosure and sale of the Project, shall fully satisfy all claims that the Subcontractor has against the Contractor. If the foregoing is deemed unenforceable by a Court of Law, then the Subcontractor's prosecution of it's Mechanic Lien claim and collection, if any, of any such judgment upon foreclosure and sale of the Project, shall be a condition precedent to the right of the

Subcontractor to pursue any claim against the Contractor. Nothing herein is intended to limit the Contractor's rights against the Subcontractor under any other terms of this Subcontract.

18.2 The failure of the Subcontractor after ten (10) days written demand by PCS or the Owner to satisfy, discharge and/or bond a Mechanics Lien filed by a subcontractor or supplier of the Subcontractor, shall constitute a material breach of this Agreement.

18.3 The Subcontractor shall within ten (10) days of the date of this Agreement, provide PCS with an accurate and full list of names and addresses of each subcontractor or supplier or other party with whom is shall contract and who may have a right to file a Mechanics Lien pursuant to the Provisions of the Law. The obligations of the Subcontractor to comply with the provisions hereof shall be a continuing obligation and the Subcontractor covenants and agrees that it shall furnish the name and address of such other subcontractor and/ or supplier or other parties with whom it enters into an agreement hereafter, who may have a right to file a Mechanics Lien pursuant to the provisions of law.

18.4 If the Subcontractor files a Mechanics Lien, which is ultimately judged to be invalid or overstates the amount properly subject to a Mechanics Lien, then the Subcontractor shall in addition to all liabilities resulting from the provisions of the law, be liable to PCS and the Owner for all bonds, deposits or costs of removal of the invalid Mechanics Lien and/or the overstated portion of such Mechanics Lien (including without limitation all attorney fees and expenses), and the Subcontractor shall indemnify and save harmless, the Owner and PCS harmless from and against all resulting losses and expenses of any kind or nature.

### *ARTICLE XVIII*

*ASSIGNMENT AND SUBCONTRACTING*

19.1 Neither this Agreement nor any monies due or to become due hereunder shall be assignable without prior written consent of PCS. Any such assignment without prior written consent shall be void and of no effect and shall vest no right or right of action in the assignee against PCS. PCS's consent to any assignment shall not relieve the Subcontractor of any of its agreements, duties, responsibilities or obligations under this Agreement and other Contract Documents, and the Subcontractor shall be and remain as fully responsible and liable for the defaults, neglects, acts and omissions of its assignees and all persons directly or indirectly employed by them as it is for its own defaults, neglects, acts, omissions, and those of its officers, servants and employees.

19.2 Except for the sub-subcontractors indicated in the annexed Schedule D, who have been conditionally approved, the Work, in whole or in any part, shall not be sub-subcontracted without the prior approval of PCS. The conditional approval of the sub-subcontractors named in Schedule D can be canceled by PCS if in

PCS's sole discretion the sub-subcontractor at any time refuses or neglects to supply sufficient skilled workmen or materials of the proper quality and quantity, to fulfill, at a minimum, the requirements of the Schedule, or fails in any respect to prosecute the Work with the utmost promptness and diligence, or causes by any act or omission the stoppage or delay of or interference with or damage to its own Work, the Work of the Subcontractor, the work of PCS or the work of any other subcontractors on the Project, or fails in the performance of any terms and provisions of this Agreement or any other Contract documents, or should PCS or the Architect determine that its work or any portion thereof is not being performed in accordance with the Contract Documents. If such conditional approval is canceled the Subcontractor must submit a potential replacement sub-subcontractor to PCS for approval within two (2) days after receiving said notice from PCS. No sub-subcontractor indicated in Schedule D shall be removed or replaced except as directed by or with the prior approval of PCS. PCS shall not be obligated to grant such approvals if PCS, the Architect or the Owner have no such objection, whatsoever, to a potential sub-subcontractor proposed by the Subcontractor. Any sub-subcontracting without such prior approval shall be void and of no effect and shall vest no right or right of action in the sub-subcontractor against PCS. PCS's consent to any sub-subcontracting shall not relieve the Subcontractor of any of its agreements, duties, responsibilities or obligations under this Agreement and the other Contract Documents, and the Subcontractor shall be and remain as fully responsible and liable for the defaults, neglects, acts and omissions of its sub-subcontractors and all persons directly or indirectly employed by them as it is for its own officers, servants and employees. The Subcontractor shall bind each of its permitted sub-subcontractors to all terms, provisions and covenants of this Agreement and other contract documents. PCS's consent to any sub-subcontracting shall not be deemed to create any contractual or third party beneficiary relationship between PCS and any sub-subcontractor to whom the Work or any portion thereof is subcontracted, and shall not vest any right of action in such sub-subcontractor against PCS or the Owner.

19.3 Any conditional approval of sub-subcontractors, or any lack of action of PCS pursuant to this Article, shall not constitute the basis of any claim by the Subcontractor or its sub-subcontractors for an increase in the Price or an extension of time.


## ARTICLE XIX

### TERMINATION OF AGREEMENT

20.1 PCS shall have the right at any time upon three (3) days written notice to the Subcontractor, to terminate this Agreement and require the Subcontractor to cease work hereunder, in which case, provided the Subcontractor is not then in default, PCS shall indemnify the Subcontractor against costs directly resulting from such termination, except that the Subcontractor shall not be entitled

to anticipated profits or overhead on Work unperformed or on materials or equipment unfurnished, subject however to the limitations of paragraph 20.2.

20.2 PCS shall have the right, in the event of a termination of the Contract for any cause, at any time, to cancel this Agreement and require the Subcontractor to cease work thereon. In that event, PCS shall be liable to Subcontractor for no more than the Amount actually received by it for the Work performed by the Subcontractor to date of termination less PCS's appropriate share of said sums; and in no event shall the amount received by the Subcontractor be a greater sum than that which PCS obtains from the Owner weather the such sum is received by reason of additions, omission or termination; and deducted therefrom shall be the Subcontractors proportionate share of all expenses incurred by PCS (including litigation cost and attorney fees, and disbursements, if any) and reasonable overhead and profit to PCS. The recovery, if any, by the Subcontractor shall be entirely conditioned upon the receipt of payment by PCS from the Owner. In the event of a deduction related to the Work, the amount of the deduction taken by the Owner shall be binding upon the Subcontractor.

## ARTICLE XXI

### GUARANTEES

21.1 The Subcontractor hereby guarantees the Work to the full extent provided in the drawings, specifications and other Contract Documents. The Subcontractor shall remove, replace and/or repair at its own expense and at the convenience of the Owner any faulty, defective or improper work materials or equipment discovered within one (1) years from the date of the final acceptance of this Project as a whole by the Architect and the Owner or for such longer periods as may be provided in the drawings, specifications, general conditions, special conditions, or other contract documents or as may normally be provided by the manufacturers, as may customarily be obtainable under the circumstances, or by law.

## ARTICLE XXI

### ACCIDENT PREVENTION

22.1 The Subcontractor agrees that the prevention of accidents to workmen engaged upon or in the vicinity of the Premises is its responsibility. The Subcontractor agrees to comply with all Federal, State, County and Municipal laws, ordinances, rules, regulations, codes, standards, orders, notices and requirements concerning safety as shall be applicable to the Work, including, among others, the Federal Occupational Safety and Health Act of 1970, as amended, and all standards, rules, regulations and orders which have been adopted or issued thereunder, and with the safety

standards established by PCS, during the progress of the Work. When so ordered, the Subcontractor shall stop any part of the work which PCS deems unsafe until corrective measures satisfactory to PCS have been taken, and the Subcontractor agrees that it shall not have or make any claim for damages growing out of such stoppages. Should the Subcontractor neglect to take such corrective measures, PCS will do so at cost and expense of the Subcontractor and may deduct the cost thereof from any payments due or to become due to the Subcontractor. Failure on the part of PCS to stop unsafe work practices shall in no way relieve the Subcontractor of its responsibility thereof. The Subcontractor agrees to indemnify, defend, protect, and save harmless PCS, the Architect and from the Owner from any and all claims, actions, fines and penalties brought or imposed or judgments rendered thereon, and from and against any and all loss, damages, liability, cost and expenses, including legal fees and disbursements, which PCS, the Architect and/or the Owner may sustain or incur in connection therewith.

22.2 The Subcontractor agrees to reduce the Price by $250 for each occurrence when an employee of a Subcontractor is on the premises and not wearing a hard hat or required eye protection, or is not properly using any safety protection required by the character of the Work. The Subcontractor agrees to remove any employee from the Premises who is the cause of more then two Price reductions resulting from this Article.

22.3 The Subcontractor shall notify PCS of any injury to any one of it's employee or any employee of one of it's subcontractors on the day of the injury and provide a written description on PCS's form of the injury within 24 hours of such injury.

22.4 The Subcontractor shall hold weekly safety ("Tool Box") meetings and shall provide proper minutes of such meetings to PCS within five (5) days working days.

22.5 When safety protection has been installed by others, the Subcontractor shall remove this protection for the installation of the Work and replace such protection or provide a suitable and acceptable alternative in accordance with Federal, State, County, Municipal jurisdictional agency standards and acceptable to PCS.

22.6 Notwithstanding any other provision of this Subcontract, the Subcontractor acknowledges that it is ultimately responsible for all construction safety procedures and precautions under Federal, State, County and Municipal law, and the Subcontractor shall hold, indemnify, defend and save the Owner, the Architect and PCS harmless from and against any and all claims or expenses including attorney's fees and disbursements resulting from any act taken by any employee of the Subcontractor, a sub-subcontractor, or any injury or damage caused by any unsafe or negligent act or occurrence resulting from the Work.

## ARTICLE XXII

### INDEMNITY AND INSURANCE

23.1 To the fullest extent permitted by law, the Subcontractor hereby assumes and agrees to indemnify, defend and hold harmless PCS, the Owner, its partners and/or subsidiaries, the Architect, and their respective agents, officers and employees (hereinafter collectively "Indemnitees") from and against any and all claims, suits, damages, liabilities, professional fees, including attorneys' fees, costs, court costs, expenses and disbursements relating to any death, personal injury or property damage, including the loss of use thereof, brought or assumed against any of the Indemnities by any person or firm, arising out of or in connection with or as a consequence of performance of the Work of the Subcontractor under this Subcontract, as well as any additional work, extra work or add on work whether caused in whole or in part by the Subcontractor or any person or entity employed, either directly or indirectly, by the Subcontractor, including any subcontractors thereof and their employees. The parties hereby expressly agree that this indemnification agreement contemplates: (i) full indemnity in the event of liability imposed against the Indemnitees without negligence and solely by reason of statute, operation of law or otherwise; and (ii) partial indemnity in the event of any actual negligence on the part of the Indemnitees either causing or contributing to the underlying claim in which case, indemnification will be limited to any liability imposed over and above that percentage attributable to actual fault whether by statute, by operation of law or otherwise. Where partial indemnity is provided under this Subcontract, the costs, professional fees, attorneys' fees, expenses, disbursements, court costs, etc. shall be indemnified on a pro rata basis. Indemnification under this paragraph shall operate whether or not the Subcontractor has placed and maintained insurance specified under Article 23.2 or any other provision of this Subcontract. In the event of any such claims, loss, costs, expense, liability or damage arise, or are made, asserted or threatened against Indemnitees, PCS shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in PCS's judgment to protect and indemnify the Indemnitees from and against any and all such claims, loss, costs, expense, liability, damage or injury, including professional fees, attorneys' fees and disbursements or PCS, in its discretion, may require the Subcontractor to furnish a Surety Bond satisfactory to PCS guaranteeing such protection, which Bond shall be furnished by the Subcontractor within five (5) days after written demand has been made therefore.

23.2 Before commencing the Work, the Subcontractor shall procure and maintain, at its own expense, until final acceptance of the Work and throughout the term of the warranty of the Work, at least the following insurance from insurance companies satisfactory to PCS:

Workmen's Compensation Insurance   $Statutory   Per Location

Employers Liability Insurance  $2,000,000   Per Occurrence and Per Location

Compressive General Liability  $2,000,000 Including        blanket contractual, products and completed operations (explosions, collapse and underground coverage if applicable); the   Contractors Protective Liability if the Subcontractor subcontracts to another all or any portion of the work; the following limit, combined Bodily Injury and Property Damage  $2,000,000  Per Occurrence and Per Location

$2,000,000 Aggregate Applies

Compressive Auto Liability naming Allowed, non-owned and hired vehicles with the following limit  $2,000,000    Per    Occurrence and Per Location

Umbrella Liability in excess of Employers Liability, Comprehensive General Liability and Comprehensive Auto Liability (no more restrictive than the underlying Insurance)   $5,000,000        Per Occurrence and Per Location

**Primary Insurance:** As respects General Liability, Business Automobile & Umbrella Liability, policies have been endorsed and stipulate that this insurance is primary, for all additional insureds; and any other insurance of self-insurance maintained by PCS, Owner, etal., shall be excess only and shall not be called upon to contribute with this insurance.

Before commencing the Work, the Subcontractor shall furnish a certificate of insurance in a form satisfactory to PCS, naming PCS and the Owner as additional insured from each insurance company showing that the above insurance is in force, stating policy numbers, dates of expiration, and limits of liability there under, and further providing that the insurance will not be canceled or changed until the expiration of at least thirty (30) days after written notice of such cancellation or change has been mailed to and received by PCS. If the Subcontractor fails to procure and maintain such insurance, PCS shall have the right to procure and maintain the said insurance for and in the name of the Subcontractor and the Subcontractor shall pay the cost thereof and shall furnish all necessary information to make effective and maintain such insurance.

23.3 The Subcontractor covenants and agrees that it shall not sublet any part of the Work hereunder without requiring its subcontractor to purchase and maintain insurance policies and coverage required by the terms and conditions of paragraph 23.2. The Subcontractor shall furnish satisfactory evidence that its subcontractors have purchased said insurance by causing a certificate of insurance to be furnished to PCS.

23.4 Compliance by the Subcontractor with the foregoing requirements as to the carrying of insurance and furnishing of certificates of insurance, shall not in any way relieve the Subcontractor from any liability or diminish its obligations under this

Article or any other provision of this Agreement.

23.5 Within twenty-four (24) hours of all accidents or occurrences resulting in injury to the Subcontractor's employees, or third parties or damage to property of another, the Subcontractor shall submit to PCS a written report on PCS's form. When requested by PCS the Subcontractor shall furnish PCS with a copy of any reports prepared for submission to the Subcontractor's insurance company.

23.6 The Subcontractor and its insurers do hereby waive any and all rights of subrogation against PCS, the Architect, the Owner and their insurers.

### ARTICLE XXIII

DISPUTE RESOLUTION

24.1 Except as provided in paragraph 24.2 below, any and all disputes arising out of and/or related to this Agreement and the performance of the Work at the Project, shall be decided solely in the State Court System, in the State of New York and venue in any such action must be placed in the County of Queens Borough and to which jurisdiction the Subcontractor consents.

24.2 In the event that a dispute exists between the Subcontractor and PCS arising out of and/or related to a modification of the Contract or any action by the Owner and/or Architect and in the event that PCS actually commences an action of proceeding against the Owner, at any time whatsoever, then the dispute between PCS and the Subcontractor shall be decided in the same manner, location and forum as provided in the Contract. In the event that an action has been previously commenced by the Subcontractor against PCS, the Subcontractor agrees to withdraw such action, and participate in such action or proceeding and to present its own claim therein, through an attorney chosen by PCS at the Subcontractor's own expense and to be bound by the decision rendered thereon. The joinder of additional parties by PCS or the Owner, or the consolidation of such proceeding, shall in no matter invalidate or limit the provision of this Article. It is expressly understood that the purpose of this paragraph is to ensure consistency in the resolution of disputes arising out of all work at the Project, in the event that PCS, in its sole and exclusive discretion, commences an action against the Owner.

24.3 In no event shall PCS be liable to the Subcontractor for Work performed or any other cause whatsoever except in the extent that PCS may recover therefore, from the Owner. In the event of such a recovery, the amount awarded to PCS on account of the Subcontractor's claim shall be paid to the Subcontractor less the Subcontractor's proportionate share of the expenses, costs and attorney fees incurred by PCS in prosecuting the claim. In addition thereto the Subcontractor's recovery shall be diminished by reasonable overhead and profit markup to PCS

24.4 When this Agreement is signed by PCS, it is deemed executed and delivered in the State of New York and shall be construed in

accordance with the Laws of the State of New York without any consideration being given to any principles of choice or conflict of laws.

## *ARTICLE XXIV*
*INCONSISTENT TERMS*

25.1 In the event that there is an inconsistency between the specific terms of this Agreement and the terms of the Contract, general conditions or supplementary conditions, or any other Contract Document, then the terms of this Agreement shall have precedence and govern unless, the Subcontractor shall have advised PCS upon the execution of this Subcontract of such conflict or inconsistency in which event, PCS shall have the sole and exclusive discretion to render an interpretation of and decision as to which Contract Document had precedence or PCS may refer the matter to the Owner for an interpretation and decision. In either event the decision of PCS or the Owner, shall be final, conclusive and binding upon the Subcontractor.

## *ARTICLE XXV*
*BONDS*

26.1 Provide Labor and Performance bond, if requested by PCS. Cost of bond to be reimbursed by PCS upon presentation of cancelled check and letter from bonding company indicating bond fully paid and active.

## *ARTICLE XXVII*
*NO DELAY BY SUBCONTRACTOR*

27.1 Notwithstanding the fact that a dispute, controversy or question shall have arisen in the interpretation of any provision of this Agreement regarding the performance of any Work, the delivery of any material, the payment of any monies to the Subcontractor, or otherwise, the Subcontractor agrees that it will not directly or indirectly stop or delay any Work or part of Work required to be performed, or stop or delay the delivery of any materials required to be furnished hereunder, pending the determination of such dispute or controversy.

## *ARTICLE XXVIII*
*ENTIRE AGREEMENT*

28.1 No oral representations or other agreements or understandings have been made by PCS except as stated in this Agreement. This Agreement may not be changed in any way except as herein provided, and no term or provision hereof may be waived by PCS except in writing signed by its duly authorized officer. This Agreement constitutes the entire negotiated Agreement between the parties hereto, the terms of which shall not be construed against PCS as the drafter of this document.

28.2 The failure of PCS to insist in anyone or more instances upon a strict compliance with any provision of this Agreement, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment of the right of PCS thereafter to require compliance with such provision or a waiver of the right of PCS thereafter to exercise such option, but such provision or option will remain in full force and effect.

28.3 In the event that any article, paragraph, term or condition of this Agreement is deemed to be invalid pursuant to any rule, regulation, law, ordinance, code, decision of any court having jurisdiction over the parties or for any reason whatsoever, previously or hereafter enacted, all other articles, paragraphs, terms or conditions shall be unaffected thereby and remain in full force and effect.

28.4 The title of each Article is for convenience only. No such title shall diminish, affect or alter any term or condition of this Agreement.

### ARTICLE XXIX
### PROGRESS REPORTS

29.1 The Subcontractor shall furnish on a form acceptable by Owner, daily sign in sheets of the Work, including the name, SS# , hours worked and signature of each labor/tradesman, and their activities and the status of materials or equipment, that may be in the course of preparation or manufacture, as required by PCS. The Subcontractor shall submit Daily Progress Reports to PCS by no later than 10:00 AM on the day after any Work is performed on the Premises.

### ARTICLE XXX
### INDEMNIFICATION

30.1 To the fullest extent permitted by law, the Subcontractor shall indemnify, defend and hold PCS, the Owner, the Owner's subsidiaries and associates, the Architect/Engineer and their respective agents and employees (the "Indemnities") harmless from all claims, loss, costs and expenses (including attorney's fees and disbursements) whether arising before or after completion of the Subcontractor's Work, caused by, arising our of, resulting from, or incurring in connection with, the performance of the Work by the Subcontractor, its sub-subcontractors, their agents and employees, their presence on the premises or the breach of this Agreement whether or not caused in part by the active or passive negligence or other fault of the Indemnities excepting only such claims, costs, expenses or liabilities caused by the sole negligence of the Indemnitees. This indemnification agreement includes all claims for nonpayment by sub-subcontractors, laborers, vendors and materialmen for labor or material, and all construction or mechanics lien, builders trust fund or similar claims.

30.2 In any and all claims against PCS the Owner or the Architect/Engineer or any of their agents, contractors, or employees by any employee of the Subcontractor, or sub-subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation under this Article shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor or any sub-subcontractor under workers' or workmen's compensation acts, disability benefit acts or other benefit acts.

30.3 The obligations of the Subcontractor under this Article shall not extend to the liability of the Architect/Engineer, its agents or employees, arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect/Engineer, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage and provided further, in the case of a failure to give, the Architect/Engineer had a duty to give such directions or instructions.

30.4 The obligations of the Subcontractor under this Article shall survive the termination of this Subcontract as to all matters arising prior to the date of termination and shall be fulfilled at no cost or expense to PCS or the Owner.

### *ARTICLE XXXI*
*MISCELLANEOUS*

31.1 The Subcontractor shall place and relocate his trailers when and where directed by PCS. The Subcontractor is responsible for the acquisition, maintenance and removal of all utilities and telephone services required for their trailers. All energy charges will be paid by the Subcontractor.

31.2 The cost of the Master Mechanic and/or Teamster Steward, if required, will be prorated between all Subcontractors on the Project in accordance with their contributions to the requirement of same and the Subcontractor agrees to pay PCS accordingly.

31.3 The said parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all of the terms and provisions herein contained.

31.4 Any notices, demands or requests which may be given hereunder to the respective parties shall be in writing and delivered personally or sent by FAX, Telegram, Federal Express, etc. addressed to the undersigned at the address noted on Page 1 of this Agreement.

31.5 The Subcontractor shall provide all temporary power required for the Work beyond the standard OSHA requirements for 110 Volt outlets which will be provided by PCS.

31.6 The Subcontractor acknowledges that the performance of the

Work may not be a continuous operation and the Subcontractor agrees to "come back" to the Premises as directed by PCS, and as required, in order to complete the Work.

31.7 The Subcontractor shall include Allowances set forth in the Contract Documents. Such Allowances shall include the cost of material and equipment delivered to the Premises and all taxes, less applicable trade discounts, as well as the cost of actual professional services, testing or inspection costs (hereinafter the Permitted Actual Costs). The Subcontractor's costs for unloading, hoisting, handling, installing, overhead and profit and all other administrative costs are included in the Price and are not to be attributed to the Allowance. Upon completion of the Work a Change Order will be issued for the difference between the Allowance and the Permitted Actual Costs.

31.8 The Subcontractor shall maintain on the Premises a "Record Set" of the drawings, specifications, addenda, bulletins, change orders, and other modifications thereto as well as all approved shop drawings, product data, samples and similar required submittals (hereinafter the "Record Set"). The Record Set shall be kept in good order and shall be marked currently to record any changes and/or selections made during the execution of the Work. The Record Set shall be available at any time to PCS, the Architect or the Owner for their use. At the completion of the Work, the Record Set shall be submitted to PCS.

31.9 The Subcontractor agrees to reduce the Price by $250 for each occurrence when an employee, agent or sub-subcontractor of the Subcontractor or the agent or employee of any of its sub-subcontractor does not comply with any of the requirements of the Site Logistics Plan or the Orientation and Procedures for Subcontract Personnel. The Subcontractor agrees to remove any employee and/or sub-subcontractor from the Premises who is the cause of more than two (2) Price reductions resulting from this Article.

31.10 For this entire Agreement, the use of the word "State" shall mean the State Of New York.

31.11 The obligation of this Subcontractor under this Agreement shall survive the termination and completion of this Subcontract as to matters arising prior to the date of termination and shall be fulfilled at no cost or expense to PCS or the Owner.

31.12 The Subcontractor agrees that each reduction to the Price and service charge required to be paid by the Subcontractor for its failure, or the failure of any person acting on its behalf, to perform as required hereunder is a realistic estimate of the administrative costs to PCS for such failure to perform. The Subcontractor's obligations with respect to such amounts shall be in addition to, and not in lieu of, any other costs or damages resulting from any failure to perform hereunder.

**Schedule A** – **K.G. Industries Inc. Proposal (For reference only)**

**Schedule B** - **Work Schedule ( Contract Baseline Schedule )**

**Schedule C** - **Disc with Contract's Specifications and Drawings**

**Schedule D** - **Prevailing Wage Rate Schedule**

**Schedule E** - **Certified Payroll & Payment Forms**

**Schedule F** – **Schedule of Payments**

**IN WITNESS THEREOF**, the parties have hereunto set their hands or caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

SUBCONTRACTOR:

| | |
|---|---|
| *K.G. INDUSTRIES Inc.* | *PADILLA CONSTRUCTION SERVICES* |
| SIGNED: | SIGNED: |
| BY: RAMESH V. SHAH | BY: Alexander T. Holuka |
| TITLE: VICE PRESIDENT | TITLE: Vice President |
| DATE: 12/06/ 2005 | DATE: 1-25-06 |

ATTEST: _____ G.J. KOTHARI.

Subcontractor's _____ NY _____ State Unemployment Ins. 30-402868

*(Insert State and Register No. for State in which work is to be performed).*

Subcontractor's License No._____

*(Insert License No., if any, for State or Locality in which the work is to be performed).*

## SCHEDULE E- SCHEDULE OF PAYMENTS*

**QCD14- NEW SANITATION GARAGE AND SALT SHED**

CONTRACT NO:
CONTRACTOR: K.G.INDUSTRIES

SBS MODIFIED MEMBRANE ROOFING

| COST CODE | SCHED ID NO | DESCRIPTION | LOC | QTY | UNIT | SUBTOTAL |
|---|---|---|---|---|---|---|
| | | **G051 SBS Modified Membrane Roofing** | | | | |
| 389 | 8512 | INSTALL ROOF INSULATION ADMIN AREA | ROOF | 1 | 1 | $30,000.00 |
| 390 | 8514 | INSTALL ROOF MEMBRANE ADMIN AREA | ROOF | 1 | 1 | $95,000.00 |
| 391 | 8630 | INSTALL ROOF INSULATION TRUCK WASH | ROOF | 1 | 1 | $55,000.00 |
| 392 | 8632 | INSTALL ROOF MEMBRANE TRUCK WASH | ROOF | 1 | 1 | $211,535.00 |
| 393 | 8714 | INSTALL ROOF INSULATION VEHICLE REPAIR | ROOF | 1 | 1 | $30,000.00 |
| 394 | 8716 | INSTALL ROOF MEMBRANE VEHICLE REPAIR | ROOF | 1 | 1 | $95,000.00 |
| 395 | 8806 | INSTALL ROOF MEMBRANE PENTHOUSE | ROOF | 1 | 1 | $25,000.00 |
| 396 | 8516 | INSTALL ROOF FLASHING ADMIN AREA | ROOF | 1 | 1 | $18,000.00 |
| 397 | 8634 | INSTALL ROOF FLASHING TRUCK WASH | ROOF | 1 | 1 | $30,000.00 |
| 398 | 8718 | INSTALL ROOF FLASHING VEHICLE REPAIR | ROOF | 1 | 1 | $14,000.00 |
| 399 | 8808 | INSTALL ROOF FLASHING PENTHOUSE ROOF | ROOF | 1 | 1 | $3,000.00 |
| | | **TOTALS** | | | | $606,535.00 |